## SUPREME COURT.

### THE PEOPLE OF THE STATE OF NEW YORK agt. THE ALBANY AND VERMONT RAILROAD COMPANY.

The people, by their *attorney-general,* have the right to bring an action to compel a *railroad company* to repair a portion of their road, and to operate the same. (*People* agt. *Mayor, &c., of New York, ante, p.* 155, *is decisive of this principle.*)

After a *railroad* is completed for use, and is used, the *company* have no right at their pleasure, and without imperious necessity, to *abandon* or *discontinue* any portion of it. Railroads are constructed for public use, and the public have rights in them which should be protected.

Where the public interests demand the running of a portion of a railroad which has been declared discontinued by the company, for their supposed advantage merely, no necessity being shown for such a course, the court will grant an injunction restraining them from removing the rails, &c., pending an action to compel them to repair and operate such portion of their road.

*Albany Special Term, September* 1860.

THIS is a motion to continue until the hearing of the preliminary injunction heretofore issued, restraining the defendant from removing the iron rails upon some twenty miles of the eastern portion of this road. In 1851, a corporation, known as the Albany Northern Railroad Company, was organized under the general railroad act, to construct a railroad from the city of Albany to Eagle Bridge, in Rensselaer county. The road was completed and put in operation somewhere about 1853, and was run until September, 1859. This railroad was sold under a mortgage foreclosure on the 19th of September, 1859. The purchaser, with certain associates, on the 6th of October, 1859, organized the road anew, over the same track, by its present name of the Albany and Vermont Railroad Company, but with the exception of some twenty days, the defendant has not run or in any manner operated the said eastern portion of its road since that time, and the defendant has removed a portion of the iron rail therefrom. On

the 12th of June, 1860, the defendant leased to the Rensselaer and Saratoga Railroad Company during defendant's corporate existence, that portion of its road lying between the city of Albany and a point one thousand feet north of its intersection with the Rensselaer and Saratoga road, at an annual rent of twenty thousand dollars, with a clause in the lease making it void at the option of the lessee, in case any part of the defendant's road east of the Hudson river should be operated to carry freight or passengers. This provision applies to that portion of the road now in controversy.

It appears that the defendant's road originally cost over two millions of dollars, more than half of which was contributed by the citizens of Albany, and that the city, in its corporate capacity, advanced $300,000 towards the completion of the road, but that it cost its present owners only about $160,000; that a responsible offer to hire said road and its property for ten years, at an annual rent of $21,000, and to keep the same in good running order, was made to defendant before it made the lease above alluded to. This offer was declined.

It also appears that parties owning stock in the Rensselaer and Saratoga company, uniting with stockholders in the Troy and Boston company, or that the friends of those roads, in April, 1860, purchased a majority of defendant's stock, and thereafter controlled the defendant's road, and under their direction the lease was made to the Rensselaer and Saratoga road, and the track on the eastern portion of defendant's road is directed to be taken up.

In this way all connection by defendant's road from Albany to Eagle Bridge and to Rutland is cut off. Passage for all north or east of Rutland may be had to Albany direct, by the way of Whitehall over the Rensselaer and Saratoga road, and from Rutland to Eagle Bridge, and thence by way of Troy to Albany; but a transhipment of

freights is thus made necessary to cross the river at Albany, and a large increase of expense thereby necessarily incurred.

J. GIBSON *and* J. H. REYNOLDS, *for the motion.*
J. B. GALE, A. B. OLIN *and* W. A. BEACH, *opposed.*

PECKHAM, Justice. The complaint herein, on behalf of the people, asks for an injunction, and also prays that the defendant may be compelled by the decree of this court, to put its road in repair as to its eastern portion, and to operate the same. This case is novel in this country, and by no means free from difficulties.

By the present arrangement, the main purpose for which the defendant's road was originally constructed, is destroyed. Yet if no law has been violated, the remedy is not with the court.

Several objections are urged to this application, which I shall briefly consider: First. It is said that the people, through their attorney-general, have no right to bring this action. The contrary has been held in this court, in the *People* agt. *The Mayor, &c., of New York* (19 *How.*, 155), a case entirely analagous in principle, and I shall be governed by that decision. The following are also authorities in the same direction: *The People* agt. *The Mayor, &c., of New York*, an able opinion by Judge HOGEBOOM, on application for an injunction in reference to the Brooklyn ferry, also *Doolittle* agt. *Supervisors of Broome County* (18 *N. Y. R.*, 160; *s. c.*, 16 *How.*, 512).

It is next insisted that the defendant has a right to abandon 'any portion of its road whenever it choses, and the public is without remedy; that there is no imperative direction by any statute requiring its continued operation, hence that this court has no power to compel defendant to repair its road. The defence has failed to find any statute authorizing a railroad company, absolutely at its pleasure,

to abandon part of its road; and I am not aware of any common law, or inherent right to do so after the road is completed. The statute authorizes the directors of a road to change its route, or any part of it, by a vote of two-thirds of their whole members, if it shall appear to them that the line can be improved thereby. (2 *R. S.; 5th ed.*, *p.* 677, § 26.)

The defendant insists that at a meeting of "more than a majority" of its directors, on the 29th ult., they resolved to discontinue that portion of their road lying east of Johnsonville, in Rensselaer county. If this is claimed as an exercise of its right to change its route, it is a sufficient answer to say that it does not appear that the change was made by a vote of two-thirds of its directors, and the resolution was therefore void. But the resolution evidently refers to a *change*, not to a discontinuance of its route, or any part of it. This resolution recites that the track of defendant "is connected at Johnsonville with the track of the Troy and Boston road, and thereby the same points of termination are reached by railroad communication, that have been or may be reached by the present line of the road of this company," and as it is unprofitable and unnecessary for this company longer to operate that part of its road, &c., therefore it is resolved to discontinue it.

This resolution entirely fails to comply with the statute authorizing an agreement to be made by two companies, "embracing for a portion of their lines the same location of line," for the construction of so much of said line as is common to both, by one of said companies, and for the manner and terms upon which the business thereon shall be performed. Any road so connecting may alter and amend its articles of association, so as to terminate at the point of intersection, &c. These sections, especially the first, would seem to apply to roads not yet constructed, and an arrangement is to be made with the road constructing the single line, to do the business of the other for a certain distance on that

line. (2 *R. S.*, *5th ed.*, 693, 694, §§ 68, 69.) Here no arrangement of that sort is pretended. In fact it would be contradictory of the defendant's whole course of action, as it admits its intention to abandon and not operate any part of its road east of its junction with the Rensselaer and Saratoga road. Hence it could have no business to do at or near or east of Johnsonville, in regard to which it could make any agreement. There is a provision in the statute in regard to turnpike roads, authorizing them to discontinue any part of their road in the manner there pointed out. Thus by implication expressing the sense of the legislature, that such authority was necessary to that end. Authority is also given, upon certain terms, to railroads, by the section before referred to, to terminate their road at the point of intersection. This section, however, contemplates the substantial continuance of the road through another, and the same full accommodation of the public. The act is permissive, not prohibitory. The roads may terminate, not that they shall not terminate, thus evincing the sense of the legislature, that they could not otherwise change. These railroads are constructed for the public use. They are authorized to go over, occupy and own the land of any citizen, against his will, thus exercising the right of eminent domain, on the sole ground that such road is for the public use and benefit. In some cases lands are donated to them to aid in their construction. If they are for the public use, it would seem rational that the public should have some rights in respect to them after their construction.

It is laid down as a general principle, that there is an implied obligation on the part of the grantees of all franchises, to execute the conditions and duties prescribed in the grant. The grantee of the franchise of a ferry " is obliged to provide and maintain facilities for accommodating the public at all times with prompt and convenient pas-

sage;" the public have an interest in such franchise.   (3 *Kent's Com.*, *title Franchise*, 458, 459.)

The statute provides that every railroad " shall start and run their cars for the transportation of passengers and property at regular times, to be fixed by public notice ; " and shall take, transport and discharge such passengers and property on the due payment of the freight or fare legally authorized therefor, and shall be liable to the party aggrieved, in an action for damages for any neglect or refusal in the premises.

This provision seems to be plain and imperative.   Railroads are common carriers in this state, and it is their duty to be ready and prepared at all reasonable times to transport freight and passengers.

Suppose a road, without necessity, ceases to run over a portion of its track for a week or a month, would that be any answer to an action for not transporting freight tendered for transportation ?   I think not.   Would it be any better answer for the road to say it had concluded not to carry freight over that portion any more at all ?   If not, then this proceeding to tear up its rails, and to abandon transporting of persons and property on its eastern portion is a violation of its duty and of its charter.

Abandoning a portion of a road after large business interests have grown up in connection therewith, to further other rival interests of roads or communities, must operate disastrously and oppressively ; and if done without authority, there should be, and I think there is a remedy in the courts to see that it is not done without imperious necessity.

If the obligation of the defendant be conceded to continue the operation of its road, I do not understand the right and power of the court to prevent the defendant by injunction from depriving itself of the power of fulfilling its chartered obligations in that respect, to be seriously contested.

People agt. Albany and Vermont Railroad Company.

I think the power of the court is sustained both by principle and authority. I will refer to a single case in the court of king's bench, in England. In *Rex* agt. *The Severn and Wye Railroad Company* (2 *Barn. & Ald. R.*, 646), the railroad company, with a view of favoring a particular colliery, discontinued a branch of their road, and took up the iron thereon, the chief owners in the road having become interested in the favored colliery. The court, on application, unanimously granted a *mandamus* against the company to compel them to relay and operate their road. BEST, J., after alluding to speculators obtaining charters from parliament, under the idea of great public benefits, adds, "and where their sanction is obtained, is it to be permitted to those persons to say that they will do only that which is beneficial to themselves, and disregard entirely the interests of the public?"

It is urged here that the court should not interfere, because any one now has a right to make a road along the track proposed to be abandoned, under the general railroad act. The legislature had the power to grant that right to any one prior to the passage of the general law, so that the principle is unchanged. Since the decision of the supreme court of the United States, in the *Charles River Bridge Company* agt. *The Warren Bridge* (11 *Peters' U. S. R.*, 420), the power of the legislature on this subject has been unquestioned. Again, it is insisted that the defendant cannot operate its whole road without a loss, and without endangering its solvency. If that were so I should not interfere: no court would be justified in doing so; but I am not satisfied that such is the fact. There is great difference in the statements on this subject by the parties, and a decided impression is left upon my mind that the motive for abandonment is not apprehension of loss to the owners so far as respects this road. The proposition to lease and run the whole road for $21,000 per annum, seems to have failed to command any attention from the defendant, though

it would have paid a large interest upon the present owners investment. It seems to me the public interest demands the running of this branch of the road. The owners thought so in October last, and so declared in their articles of association organizing the road anew. It is said that a large portion of the rails will have to be removed in any event, even with the view of putting the road in order for operation. This I have no doubt is the fact, and the injunction should restrain the removal only of that portion not indispensably necessary to repair and refit the road for operation. In this modified form, in my opinion, the injunction should issue, and it is ordered accordingly.